MACDONALD RUDY
O'NEILL & YAMAUCHI, LLLP, LLP

MICHAEL D. RUDY  5105-0
mrudy@macdonaldrudy.com
RALPH J. O'NEILL    4705-0
ralphoneill@macdonaldrudy.com
ELISE C. ANDERSON 11724-0
eanderson@macdonaldrudy.com
1001 Bishop Street, Suite 2800
Honolulu, Hawaii  96813
Telephone No.: (808) 523-3080
Facsimile No.:  (808) 523-0759

Attorneys for Plaintiffs
TEVITATONGA SINAMONI
VAOKEHEKEHE CADIENTE and
VAOKEHEKEHE MOUHUNGAFA
MATAELE

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| TEVITATONGA SINAMONI VAOKEHEKEHE CADIENTE and VAOKEHEKEHE MOUHUNGAFA MATAELE, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF HONOLULU; DOE POLICE OFFICERS 1-30, inclusive, individually; and DOES 1-30, inclusive, <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT; DEMAND FOR JURY TRIAL; EXHIBITS "A" – "E"; SUMMONS |

## COMPLAINT

COME NOW, Plaintiffs TEVITATONGA SINAMONI VAOKEHEKEHE CADIENTE, also known as TEVITA CADIENTE ("Mr. Cadiente") and VAOKEHEKEHE MOUHUNGAFA MATAELE ("Mr. Mataele") (collectively, "Plaintiffs"), by and through their attorneys, MacDonald Rudy O'Neill & Yamauchi, LLP, and for their Complaint against Defendants CITY AND COUNTY OF HONOLULU (the "City and County"); DOE POLICE OFFICERS 1-30, inclusive ("Doe Officers"), and DOES 1-30 (collectively, "Defendants"), allege and aver as follows:

## INTRODUCTION

1.      This is a civil rights and state tort action arising under both federal and state law, for damages resulting from the wrongful use of excessive and deadly force against Mr. Cadiente on January 1, 2024, causing serious physical, cognitive, and psychological injuries; resulting from the violent assault, battery, and intentional and negligent infliction of emotional distress upon both Mr. Cadiente and Mr. Mataele; and resulting from the negligence and negligent supervision and training of Defendants.

## DEMAND FOR JURY TRIAL

2.      Plaintiffs hereby demand a trial by jury of all issues herein.

2

## JURISDICTION

### (Federal Causes of Action)

3.     This action is brought by Plaintiffs pursuant to 42 U.S.C. § 1983 to redress violations perpetrated by Defendants, and each of them, while acting under color of state law, municipal law, custom, or policy of certain rights secured to Plaintiffs by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and § 1343.

## JURISDICTION

### (State Causes of Action)

4.     Jurisdiction for the state causes of action is conferred upon this Court by the doctrine of pendent jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

5.     Venue is proper in the District of Hawaii pursuant to 28 U.S.C. § 1391(b) as the claims arose in this district.

## THE PARTIES

6.  Plaintiff     TEVITATONGA     SINAMONI     VAOKEHEKEHE CADIENTE ("Mr. Cadiente") is, and was at all times mentioned herein, a resident of the State of Hawaii, City and County of Honolulu. Mr. Cadiente, 25 years of age, is father and provider to an infant son, and is a laborer with K. T. Mataele

Contractors, a family-run masonry, concrete, remodeling, and construction business. Mr. Cadiente is of Tongan descent.

7.      Plaintiff VAOKEHEKEHE MOUHUNGAFA MATAELE ("Mr. Mataele") is, and was at all times mentioned herein, a resident of the State of Hawaii, City and County of Honolulu. Mr. Mataele, 49 years of age, is the General Foreman of K. T. Mataele Contractors and is the father of Mr. Cadiente. Mr. Mataele is of Tongan descent.

8.      Defendant CITY AND COUNTY OF HONOLULU (the "City and County") is a consolidated city-county of the State of Hawaii, established in the municipal charter adopted in 1907 and accepted by the Legislature of the Territory of Hawaii, with all the powers specified and necessarily implied by the Constitution and laws of the State of Hawaii and exercised by a duly elected City Council and/or its agents and officers.

9.      Defendant CITY AND COUNTY includes, as an entity, the Honolulu Police Department ("HPD"), a municipal agency responsible for the enforcement of the law, the protection of the citizenry of the island of Oahu, Hawaii, the training, hiring, control, and supervision of all of its officers and agents, and the implementation and maintenance of policies.

10.     Defendants DOE OFFICERS 1-30, inclusive, were at all times relevant herein, residents of the State of Hawaii, City and County of Honolulu.

11.    Defendants DOE OFFICERS 1-30, inclusive, are officers employed by HPD. At all times relevant herein, DOE OFFICERS 1-30, inclusive, were acting in their capacities as agents, servants, and employees of HPD.

12.    Defendants DOE OFFICERS 1-30, inclusive, are sued in their individual capacities.

13.    Defendants DOE OFFICERS 1-30, inclusive, are the individual members of HPD who assisted in, participated in, facilitated, permitted, or allowed the violation of the Plaintiffs' civil rights. Plaintiffs will ask leave of this Court to insert the true names and capacities of such Defendant Doe Officers 1-30 when the same have been ascertained and will further ask leave of this Court to join said Defendants in these proceedings.

14.    Defendants DOES 1-30, inclusive, are supervisory and/or policy-making officials or entities of, or entities associated with, HPD and/or the City and County, as yet unidentified, who have adopted, implemented, maintained or tolerated policies that permitted, facilitated, or allowed the violation of Plaintiffs' civil rights and the wrongful and gravely injurious use of deadly force against Mr. Cadiente on January 1, 2024, who have negligently trained, hired, or supervised officers, agents, or employees of HPD, whose actions caused said injuries, impairments, and violation of civil rights. Plaintiffs will ask leave of this Court to insert the true names and capacities of such Defendants Does 1-30 when same have

5

been ascertained and will further ask leave to join said Defendants in these proceedings.

15.  At all times relevant herein, all of the actions of Defendants were performed under color of state law and pursuant to their authority as police officers.

16.  At all times relevant herein, Defendants, and each of them, were the agents, servants, employers and/or employees of each other and were acting within the course and scope of said relationship.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.  On January 1, 2024, at approximately 7:15 a.m., wanted person SIDNEY TAFOKITAU, also known as SYDNEY TAVATITAU or PEPE ("Mr. Tafokitau"), whom authorities had failed to locate following an alleged December 16, 2023 shooting incident in which he was the suspect, allegedly opened fire on his 39-year-old ex-girlfriend, chasing her in his car after an argument. Mr. Tafokitau struck his ex-girlfriend with several gunshots while she was driving in the Halawa area, causing her to crash on Moanalua Freeway, eastbound near the Exit 1A off-ramp. Upon the arrival of emergency authorities, Mr. Tafokitau had already fled the scene in his vehicle.

18.  This begins a day-long police chase, involving a multitude of police officers and dozens of HPD vehicles. Mr. Tafokitau, whose long criminal history

included a 20-year prison sentence for robbery and gun crimes, was known to be armed with an unregistered AR-15 type rifle. Mr. Tafokitau was of Tongan descent.

19.     At approximately 11:15 a.m., Mr. Tafokitau was spotted by HPD near Aala Park and followed in an unmarked vehicle to Kalihi. Mr. Tafokitau stopped his vehicle near Gulick Avenue and Stanley Street, allowing officers to pass him, then began following these officers and firing multiple gunshots at them while they attempted to flee. A chase ensued from Wilcox Lane to Kopke Street, North King Street, Kalihi Street, and the Likelike Highway.

20.     At 11:45 a.m., on Kahekili Highway in Kaneohe, Mr. Tafokitau crashed his vehicle into a motorist, upon information and belief, named Erin Valentine, whom he then carjacked at gunpoint. Mr. Tafokitau continued the chase in Valentine's vehicle, a white Toyota Scion XB bearing the license plate "E-UNIT."

21.     At approximately 2:15 p.m., HPD officers spotted Mr. Tafokitau on Alohea Avenue in Kaimuki, where Mr. Tafokitau made a U-turn and opened fire as he drove toward the officers, then sped off, leaving the officers in continuous visual pursuit at all relevant times thereafter.

22.     For several hours, HPD vehicles tailed Mr. Tafokitau through communities across the island of Oahu, including Mililani, Waialua, Sunset, Kahuku, and Kahaluu, with no fewer than approximately five police cars closely following Mr.

Tafokitau at any given time while maintaining a continuous line of sight of Mr. Tafokitau's vehicle, in which Mr. Tafokitau was at all times the sole occupant.

23.    At 2:30 p.m., HPD made a public announcement about the manhunt.

24.    At approximately 4:00 p.m., Mr. Tafokitau opened fire on officers near Kalani High School.

25.    At 4:08 p.m., Mr. Cadiente was feeding his three-month-old infant son in his home, on the ground level of the apartment building located at 2625 Varsity Place (the "Home"), in which he lived with his father, Mr. Mataele, and other family members, when he heard sirens and saw speeding cars passing University Avenue, eastbound on the H-1 Freeway.  Although Mr. Cadiente believed at the time that one of these cars was Mr. Tafokitau's, it is now believed that these cars were additional officers deployed to aid in the intensifying manhunt, which was then approaching the University area Westbound.  Mr. Cadiente, who had been following witness updates on social media throughout the day, videotaped the speeding cars on his phone and remained on alert.

26.    At 4:11 p.m., Mr. Tafokitau and the HPD convoy passed Mr. Cadiente's and Mr. Mataele's shared Home, crossing Varsity Place while heading north up University Avenue. Mr. Cadiente and Mr. Mataele stepped outside their front door in order to observe the activity. Mr. Cadiente, who was acquainted with Mr. Tafokitau through his church and the Tongan community, attempted twice to call Mr. Tafokitau,

8

within the same minute, in hopes that he might be able to encourage Mr. Tafokitau to safely surrender.

27.     At approximately 4:12 p.m., Mr. Cadiente and Mr. Mataele stood outside the front door of their Home, observing the speeding cars that continued to stream northbound up University Avenue in pursuit of Mr. Tafokitau.  As the active vehicles appeared to stop and cluster approximately 500 yards northward on University Avenue, Mr. Cadiente and Mr. Mataele began to walk westward toward the University Avenue side of their block, to get a closer look at the action.

28.     At approximately 4:14 p.m., after several hours of visual high-speed pursuit, and with many pursuing police vehicles behind him, Mr. Tafokitau crashed his vehicle into the University Avenue bus stop immediately north of Dole St., exchanged open fire with HPD, was immediately shot, fatally wounded.  Mr. Tafokitau was administered aid and confirmed dead at the scene.

29.     At approximately 4:14 p.m., Mr. Cadiente and Mr. Mataele heard these gunshots over several seconds, while they were still walking to the University Avenue side of their block, from their Home, approximately 500 yeards south of the incident. **After** hearing the gunshots, Mr. Cadiente began jogging up University Avenue toward the gunshots, Mr. Mataele walking about 20 feet behind him, hoping that no lives had yet been lost. Because they knew Mr. Tafokitau through church and the Tongan community, Mr. Cadiente and Mr. Mataele felt that Mr. Tafokitau would more likely

listen to them than to HPD, and bravely hoped to save lives by convincing Mr. Tafokitau to stop shooting and to surrender.

30.     At approximately 4:15 p.m., when Mr. Cadiente was approximately 50 yards south of the H-1 overpass, approximately 200 yards from his Home, and approximately 300 yards from Mr. Tafokitau's crash site, an unmarked white Honda sedan abruptly pulled up just north of Mr. Cadiente, about 15 feet ahead of him, cutting off his path. Two plain clothes officers emerged, pointing firearms at Mr. Cadiente, and aggressively shouting in a way Mr. Cadiente could not understand. The officer who emerged from the driver's seat was short in stature, possibly of Portuguese-Hawaiian descent, with a mustache, a gold chain, gloves, and a gray shirt, in his 30s or 40s.

31.     With firearms suddenly pointed at him by men in civilian attire who had been driving an unmarked sedan, Mr. Cadiente turned around, in startled retreat to his father, a distance of approximately 15 feet.  Mr.  Mataele shouted to his son to put his hands up and also himself stood motionless with his hands up.  As Mr. Cadiente was approaching his father, Mr. Mataele noticed an additional vehicle pull up to the left of the unmarked white Honda. SWAT members in tactical gear and vests emerged from this second vehicle.

32.     At approximately 4:16 p.m., while Mr. Mataele was standing motionless with his hands up, and Mr. Cadiente was still slowly walking toward his father on the

sidewalk while raising his hands, a large black police van climbed the curb, hit Mr. Cadiente, smashed Mr. Cadiente into a chain link fence, and caused Mr. Cadiente to slide under the police van.

33.     The chain-link fence, partially giving way, absorbed so much deadly force from the van's impact that it was bent out of shape, and one of its concrete-reinforced metal fenceposts was broken into pieces. True and accurate photographs of the fence, taken shortly following the incident, are attached hereto and marked as **Exhibit "A"**.  This fence almost certainly saved Mr. Cadiente's life.

34.     Multiple officers pulled Mr. Cadiente out from under the police van, semi-conscious and stunned, and continuously bludgeoned Mr. Cadiente with blows to the head, using both their hands and the blunt ends of their weapons, for several minutes.  Mr. Cadiente, unresistant, passed in and out of consciousness.  A witness estimated that ten to 12 officers participated in the bludgeoning of Mr. Cadiente's head, while Mr. Cadiente was crying, helpless and nonresistant.

35.     While the police officers were beating Mr. Cadiente, it was briefly stated on the local news, in statements now removed from public view, that Mr. Cadiente was the attempted murder suspect.  Videos were also posted on social media, indicating that Mr. Cadiente had been the object of the manhunt who was thus being apprehended.

36.     Mr. Mataele repeatedly shouted, "Stop, that's my son!  We're not involved in this!"  All nearby officers disregarded Mr. Mataele's pleas, and multiple officers continued to deal incessant blows to Mr. Cadiente's head, while Mr. Cadiente was semi-conscious and pinned down.  At least one officer told Mr. Mataele, "F*ck your son!"

37.     At approximately 4:17 p.m., while Mr. Cadiente was still being beaten, Mr. Mataele was asked to lie on the ground. Mr. Mataele obliged and lay on the sidewalk. Armed officers immediately piled on top of Mr. Mataele, handcuffed his arms behind his back, and pinned his head to the ground, facing away from his son, so he could no longer see, but could now only hear, what was happening to Mr. Cadiente.

38.     At least one officer taunted Mr. Cadiente, while beating him in the head, "Oh, you like to shoot at cops, huh?"  Other officer(s) exclaimed to Mr. Cadiente, "You m@therf*cker!"

39.     Mr. Mataele was distressed that he was unable to protect a family member from being viciously beaten because the officers were pinning him down.  A true and accurate photograph, taken at 4:18 p.m. and showing Mr. Mataele being held to the ground with Mr. Tafokitau's scene of death visible in the background, is attached hereto and marked as **Exhibit "B"**.

40.     By approximately 4:18 p.m., after Mr. Cadiente had been reduced to desperate sobbing and increased semi-consciousness, the officers stopped beating Mr. Cadiente.   However, the officers continued to restrain Mr. Cadiente to the pavement.  For as long as Mr. Cadiente was kept at the scene of his beating, no officer was heard indicating that there had been a mistaken identification or that Mr. Cadiente was not the object of the manhunt.

41.     At approximately 4:19 p.m., hearing Mr. Mataele's shouts, KASADIE IMANIL ("Ms. Imanil"), Mr. Cadiente's partner and mother to Mr. Cadiente's three-month-old son and to another two-year-old son, and DARCY DANIEL ("Ms. Daniel"), Mr. Mataele's partner of 13 years and mother to his seven-year-old daughter, who had been a parent figure to Mr. Cadiente since he was 12 years old, emerged from their Home.  Ms. Imanil and Ms. Daniel pleaded with the officers to stop beating and manhandling Mr. Cadiente and Mr. Mataele, trying to explain that Mr. Cadiente and Mr. Mataele were innocent residents of the neighborhood who had nothing to do with the manhunt. The officers, however, disregarded Ms. Imanil's and Ms. Daniel's pleas and explanations, telling Ms. Imanil and Ms. Daniel that Mr. Cadiente and Mr. Mataele were under investigation.  The officers refused to answer Ms. Imanil's and Ms. Daniel's questions about why Mr. Cadiente and Mr. Mataele were being investigated.  The officers then detained Ms. Imanil and Ms. Daniel as well, albeit without using physical force.

42.     Until approximately 4:24 p.m., Mr. Mataele also remained held with his stomach to the ground, his hands cuffed behind his back, and his head forcibly pinned to face away from Mr. Cadiente, despite not physically resisting the officers in any meaningful way. At approximately 4:25 p.m., Mr. Mataele was allowed to stand up, but was kept in handcuffs and was not allowed to meaningfully observe or converse with his son, who was still surrounded by officers.

43.     At 4:30 p.m., an ambulance arrived on the scene and, urgently with sirens blaring, transported Mr. Cadiente to The Queen's Medical Center. Until the ambulance arrived, Mr. Cadiente had been kept on the ground, surrounded by officers and isolated from his family members. Mr. Cadiente received no apology nor any recognition that he was not the object of the manhunt.  It was not until Mr. Cadiente was in the ambulance, being transported to The Queen's Medical Center, that he heard a radio report indicating there had been a mistaken identity. Nevertheless, Mr. Cadiente's handcuffs were never removed until after Mr. Cadiente had been checked into the The Queen's Medical Center Emergency Room, upon the request of medical personnel.

44.     At approximately the same time that Mr. Cadiente was taken by the ambulance, Mr. Mataele overheard an officer saying words to the effect that they had gotten the wrong guy because Mr. Cadiente fit the description of the suspect, Mr.

Tafokitau.  Nevertheless, HPD refused to return Mr. Cadiente's cell phone for more than two days, until late afternoon on January 3, 2024.

45.    Until sometime between 5:00 p.m. and 5:30 p.m., Ms. Imanil and Ms. Daniel were prevented by officers from returning into their Home to care for their three young children, leaving Mr. Mataele's 13-year-old daughter to care for her younger sister and infant nephews alone.  Officers questioned and took statements from Ms. Imanil and Ms. Daniel, then after nearly an hour of detention, allowed Ms. Imanil and Ms. Daniel to return to their Home.

46.    Also sometime between 5:00 p.m. and 5:30 p.m., Mr. Mataele was released from handcuffs. However, Mr. Mataele was kept outside his Home in police custody for approximately one additional hour, until approximately 6:30 p.m. Therefore, it was not until approximately 7:00 p.m. that family members could join Mr. Cadiente in the Emergency Room.

47.    As of the date of filing this Complaint, neither HPD nor any officers have issued any formal apology for what was done to Mr. Cadiente and Mr. Mataele, despite the grievousness of this mistake. To date, no one in the City and County, from the Mayor to the personnel involved at the scene, has apologized to Mr. Cadiente, to Mr. Mataele, or to their families. This collective failure is a disgrace and a stain on the City and County's reputation, supporting inferences of ratification and approval of the

misconduct and/or a collective effort to conceal the misconduct in hopes that consequences do not materialize.

48.    Mr. Cadiente was barefoot, wearing a black, short-sleeved Raiders jersey with camouflage surf shorts, on the afternoon of January 1, 2024.  He was not wearing a hat, sunglasses, or jewelry. Mr. Cadiente is 6'3" and 220 pounds, with short hair, and was carrying only his cell phone at all relevant times.  Mr. Cadiente is significantly darker in complexion, and approximately two decades younger, than Mr. Tafokitau.

49.    Mr. Mataele was wearing an orange t-shirt, blue jean shorts, and slippers, on the afternoon of January 1, 2024. He was also not wearing a hat, sunglasses, or jewelry.  Mr. Mataele is 6'0" and 280 pounds, and bald.  Mr. Mataele had nothing in his hands at all relevant times.

50.    Meanwhile, Mr. Tafokitau was wearing a long-sleeved black jacket, a navy-blue Nike shirt, brown patterned shorts, a black baseball hat, sunglasses, and black covered sandals, at all relevant times on January 1, 2024, as was well documented and widely circulated in images and video footage. Mr. Tafokitau was 6'1" and 212 pounds, with short hair, and significantly fairer in complexion than Mr. Cadiente.

51.    At all times after 2:15 p.m., HPD maintained a continuous line of sight to Mr. Tafokitau.

52.     Throughout the all-day manhunt, Mr. Tafokitau was unaccompanied and driving or in close proximity to a vehicle, most relevantly a white Scion XB. Meanwhile, no white Scion XB or any other vehicle was at any relevant time within accessible range of Mr. Cadiente and/or Mr. Mataele, who were identifiably together during all relevant times.

53.     At the time of the illegal custody and assault of both Mr. Cadiente and Mr. Mataele, approximately 300 yards away and in a direct line of sight, there were approximately 20 or more HPD officers surrounding the fatally-wounded suspect, who lay in plain view already dead or quickly dying. *See,* **Exhibit "B"** (showing the direct line of sight between Mr. Mataele and HPD vehicles surrounding Mr. Tafokitau's body, at the time of Mr. Mataele's unlawful detention).

54.     Mr. Cadiente is known to have suffered a facial fracture, a traumatic subconjunctival hemorrhage in the left eye, a concussion, and an orthopedic injury of the left knee. Mr. Cadiente's injuries required immediate facial sutures and repeated medical follow-ups on January 2, January 5, and January 10, 2024. A true and accurate compilation of hospital photographs are attached hereto and marked as **Exhibits "C," "D," and "E,"** respectively.

55.     Mr. Cadiente continues to suffer cognitive impairment, including memory loss and confusion, vision loss, and pain upon walking. He is receiving

follow-up analysis for a torn anterior cruciate ligament, brain damage, and ocular damage.

### FIRST CAUSE OFACTION
### (DEFENDANTS DOE OFFICERS 1-30, inclusive)
### (Violations of Civil Rights of Life and Security of Person – Individual Liability, 42 U.S.C. § 1983)

56.     Plaintiffs hereby reallege those allegations contained in paragraphs 1 through 54 herein and incorporate same by reference as though fully set forth herein.

57.     Defendants Doe Officers 1-30, inclusive, acted under color of law, in their individual capacities, by engaging in the conduct complained of herein without lawful justification, therefore depriving Plaintiffs of certain constitutionally protected rights, including, but not limited to:

  a.  The right not to be deprived of life or liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

  b.  The right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution;

  c.  The right to be free from use of excessive force by law enforcement officers as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; and

  d.  The right to be free from pre-conviction punishment as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

58.    The force used by Defendants Doe Officers 1-30 was excessive and applied maliciously and vindictively for the purpose of causing harm and not in a good faith effort to achieve a legitimate purpose.

59.    The misconduct described in this Count was undertaken with malice, willfulness, intent, recklessness, and reckless indifference to the rights of others.

60.    Defendants Doe Officers 1-30 demonstrated a deliberate indifference to, and reckless disregard of, Plaintiffs' civil and constitutional rights.

61.    The actions of Defendants Doe Officers 1-30 were willful, wanton, unlawful, and in gross disregard of Plaintiffs' civil rights, justifying an award of punitive damages.

62.    No reasonable suspicion or probable cause existed for brutally mauling Mr. Cadiente, first with a police vehicle and then with handheld weapons, or for subjecting Mr. Mataele to an unlawful investigative detention on the pavement. The wanted suspect, with whom HPD had maintained a continuous line of sight for more than two hours, had already been shot and killed minutes earlier, approximately 300 yards away in a direct line of sight. HPD is equipped with communication technology and holds public duties of communication regarding such major events. Circumstances of appearance and location did not present reasonable confusion, as Plaintiffs were unarmed, retreating, restrained, and obedient, presenting no reasonable indication of danger to the public or to the

persons of Defendants Doe Officers 1-30 or any officer-colleagues who might have also been present at the scene.

63.    Race is a constitutionally protected category and cannot alone serve as a basis for discrimination by law enforcement.

64.    As a result of the acts and omissions of Defendants Doe Officers 1-30, Plaintiffs have in the past and will in the future suffer injuries and damages.

65.    Plaintiffs hereby request reasonable attorney fees and costs associated with prosecuting this action, as the violation of their constitutional rights by Defendants Doe Officers 1-30 was oppressive, harsh, cruel, and/or tyrannical.

## SECOND CAUSE OF ACTION
### (DEFENDANT CITY AND COUNTY OF HONOLULU)
**Violation of Plaintiffs' Civil Rights – Municipal Liability, 42 U.S.C. § 1983)**

66.    Plaintiffs hereby reallege those allegations contained in paragraphs 1 through 64 herein and incorporate same by reference as though fully set forth herein.

67.    Defendant City and County is responsible for establishing, maintaining, and enforcing the official policies, procedures, patterns, practices, and/or customs of the Honolulu Police Department to ensure arrest upon proper grounds and by appropriate law enforcement means, to establish reliable communication protocols between officers, and to prevent the application of deadly force without justification, generally.

68.     Defendant City and County is charged with the duty to ensure that law enforcement officers are properly trained and supervised.

69.     Defendant City and County violated Plaintiffs' federal constitutional rights by:

       a. Ratifying and approving the unlawful use of deadly force against citizens;

       b. Failing to implement and enforce policies preventing the unlawful use of force against citizens;

       c. Negligently hiring training and supervising their officers, agents, and employees, to fail to apply reasonable and commonsensical arrest protocol, and to avoid racial profiling;

       d. Tolerating, encouraging, and permitting collusive statements by involved officers in such situations;

       e. Failing to adopt a system to track, identify, and monitor problematic police behavior and patterns of unconstitutional conduct;

       f. Failing to take adequate disciplinary measures against HPD police officers who violate the civil rights of citizens;

       g. Failing to train and/or supervise officers in the constitutional requirements for use of force and the necessity of probable cause for arrest; and

       h. Failing to implement adequate and properly focused ongoing training.

70.     Defendant City and County's policies, procedures, customs, and/or practices caused the violations of Plaintiffs' constitutional and federal rights as set forth herein and in the other claims.

71.    Plaintiffs' injuries resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

72.    The need for the aforementioned training and supervision was obvious, and it was foreseeable that the inadequacy of Defendant City and County's training and supervision was likely to result in the violation of constitutional rights.

73.    Defendant City and County demonstrated a wanton, oppressive, malicious, and deliberate indifference to and/or reckless disregard of Plaintiffs' constitutional rights and those similarly situated to them.

74.    Defendant City and County's failure to train and supervise officers and other personnel caused the violations of Plaintiffs' constitutional and federal rights, as set forth herein and in the other claims, and resulted in a conscious or deliberate choice to follow a course of action from among various available alternatives.

75.    Plaintiffs hereby request reasonable attorney fees and costs associated with prosecuting this action, as Defendant City and County's violation of their constitutional rights was oppressive and harsh.

## THIRD CAUSE OF ACTION
### (DEFENDANTS DOE OFFICERS 1-30, inclusive, DEFENDANTS DOES 1-30, inclusive)
### (Intentional and/or Negligent Infliction of Emotional Distress)

76.    Plaintiffs hereby reallege those allegations contained in paragraphs 1 through 74 herein and incorporate same by reference as though fully set forth herein.

77.    Hawaii recognizes claims for Intentional Infliction of Emotional Distress ("IIED") when an intentional or reckless act, causing extreme emotional distress, is outrageous, or "without just cause or excuse and beyond all bounds of decency normally tolerated by civilized society."[1] Hawaii recognizes claims for Negligent Infliction of Emotional Distress ("NIED") when negligent conduct causes a plaintiff to suffer serious emotional distress, including physical injury to a person, property or mental illness.[2] Witnessing the serious bodily injury or death of a close family member at close proximity, under bystander theory, has been held by various courts to satisfy the injury requirement for NIED.[3]

78.    Plaintiffs were caused to suffer severe emotional upset, embarrassment, humiliation, and anguish by the intentional, extreme, and outrageous conduct of Defendants Doe Officers 1-30 and Does 1-30, and each of them, in hitting Mr. Cadiente with a moving van, continuously assailing Mr. Cadiente with fists and weapons while restrained, contemptuously disregarding Mr. Mataele's and Ms. Imanil's reasonable explanations and circumstances of

---

[1]    *Young v. Allstate Ins. Co*., 119 Haw. 403, 429, 198 P.3d 666, 692 (2008); *Hac v. University of Hawaii*, 102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003); *Enoka v. AIG Haw. Ins. Co.*, 109 Haw. 537, 559, 128 P.3d 850, 872 (2006).
[2] *Morioka v. Lee*, 134 Haw. 114, 334 P.3d 777 (2014); *See*, *Caraang v. PNC Mortgage*, 795 F.Supp.2d 1098, 1122 (D.Haw.2011) aff'd, 481 F. App'x 362 (9th Cir.2012) and amended in part, CIV. 10–00594, 2011 WL 9150820 (D.Haw.2011).
[3] *See, e.g., Smith v. Toney*, 862 N.E.2d 656, 660 (Ind. Sup. Ct. 2007); *Bowen v. Lumbermens Mut. Cas. Co*., 183 Wis.2d 627, 517 N.W.2d 432 (1994).

unambiguous innocence, all while Mr. Cadiente was complying with the directions of Doe Officers 1-30, inclusive, in the presence of his father, neighbors, and significant other.

79.    As a direct and proximate result of the actions of Defendants Doe Officers 1-30 and Does 1-30, and each of them, Mr. Cadiente was caused to suffer extreme physical, emotional, and psychological injury, harm and possible death, and Mr. Mataele was caused to contemporaneously perceive said injuries to a close family member and to suffer serious reputational damage and humiliation, all to their detriment, the exact amount of which will be proven at the time of trial.

80.    As a direct and proximate result of the actions of Defendants Doe Officers 1-30 and Does 1-30, and each of them, Mr. Cadiente was caused to suffer extreme physical, emotional and psychological injury, harm and possible death, all to his detriment, the exact amount of which will be proven at the time of trial.

81.    Aggravated circumstances of emotional distress exist in the obvious implications of racial profiling that are at stake in this case, with regard both to Plaintiffs and to all members of the greater Oahu community.

82.    The conduct of Defendants Doe Officers 1-30 and Does 1-30, and each of them, was done willfully, intentionally, with malice and oppression, and with a conscious disregard for the rights of Plaintiffs, and therefore,

Plaintiffs are entitled to punitive damages in an amount deemed appropriate to punish Defendants Doe Officers 1-30 and Does 1-30, and each of them, for their egregious and outrageous conduct, and to deter Defendants Doe Officers 1-30, Does 1-30, and others similarly situated from similar misconduct in the future.

**FOURTH CAUSE OF ACTION**
**(DEFENDANTS DOE OFFICERS 1-30, inclusive)**
**(Assault, Battery and False Imprisonment)**

83.   Plaintiffs hereby reallege those allegations contained in paragraphs 1 through 81 herein and incorporate same by reference as though fully set forth herein.

84.   On January 1, 2024, Plaintiffs were complying with officers' directions. Plaintiffs did nothing to provoke, nor did any circumstances justify, the vicious and malicious attacks perpetrated against Plaintiffs by Defendant Doe Officers 1-30, and each of them. Mr. Cadiente was, willfully, maliciously, and without just cause or provocation, hit by a moving van and violently beaten in the head by numerous Defendants Doe Officers 1-30, and each of them, incurring grave and potentially permanent physical and cognitive injuries. Mr. Mataele was threatened at gunpoint, restrained with unreasonable force, falsely imprisoned for approximately two hours, and caused to reasonably believe further harm was imminent, based on conduct by Defendants Doe Officers 1-30, inclusive.

85.     As a direct and proximate cause of the actions of Defendants Doe Officers 1-30, and each of them, Plaintiffs were caused to suffer physical and mental injuries, all to their detriment, the exact amount of which damages remain to be proven at trial.

86.     The actions of Defendants Does Officers 1-30, and each of them, were done willfully, intentionally, with malice and oppression, and with a conscious disregard for the rights of Plaintiffs and, therefore, Plaintiffs are entitled to punitive damages in an amount deemed appropriate to punish Defendants Doe Officers 1-30, and each of them, for their egregious and outrageous conduct.

## FIFTH CAUSE OF ACTION
**(DEFENDANTS DOE OFFICERS 1-30, inclusive, DEFENDANTS DOES 1-30, inclusive)**
**(Negligence)**

87.     Plaintiffs hereby reallege those allegations contained in paragraphs 1 through 85 herein and incorporate same by reference as though fully set forth herein.

88.     At all times relevant herein, Defendants Doe Officers 1-30 and Does 1-30 were subject to a duty of care to avoid causing unnecessary physical harm, distress, and risk of death to citizens as a result of police misconduct. The conduct of Defendants Doe Officers 1-30 and Does 1-30, and each of them, as set forth herein did not comply with the standard of care to be exercised by reasonable

26

police officers, thus, Defendants Doe Officers 1-30 and Does 1-30, and each of them, breached their duty of care.

89.    Mr. Tafokitau had already been shot and killed, or was quickly dying, when Defendants Doe Officers 1-30 and Does 1-30 committed their wrongful acts. Because HPD maintained a continuous line of sight with Mr. Tafokitau, while equipped with communicative technology and a duty to communicate internally, and because circumstances did not present any reasonable confusion, no justification existed for Defendants Doe Officers 1-30's and Does 1-30's conduct toward Plaintiffs at the time of the incident.

90.    As a direct and proximate result of Defendants Doe Officers 1-30's and Does 1-30's negligence as herein alleged, Plaintiffs have been damaged, in an exact amount of damages that will be proven at trial.

## **PRAYER**

 WHEREFORE, Plaintiffs pray for judgment from Defendants, and each of them, as follows:

1.    Actual, special, general, compensatory, consequential, and all other allowable damages against Defendants in amounts yet to be determined;

2.    Compensation for violation of Plaintiffs' constitutional rights, mental anguish, and humiliation;

3.      Plaintiffs' costs in this action, including reasonable attorneys fees and costs pursuant to 42 U.S.C. § 1988;

4.      An award of pre-judgment and post-judgment interest;

5.      Punitive damages; and

6.      Any other relief the Court deems just and equitable.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issus so triable.

DATED:  Honolulu, Hawaii, <u>January 16, 2024</u>.

<u> /s/ *Ralph J. O'Neill*        </u>
MICHAEL D. RUDY
RALPH J. O'NEILL
ELISE C. ANDERSON
Attorneys for Plaintiffs
TEVITATONGA SINAMONI
VAOKEHEKEHE CADIENTE and
VAOKEHEKEHE MOUHUNGAFA
MATAELE