IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| TEVITATONGA SINAMONI VAOKEHEKEHE CADIENTE and VAOKEHEKEHE MOUHUNGAFA MATAELE., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF HONOLULU, et. al, <br><br> Defendants. | Civil No. 24-00022 MWJS-WRP <br><br> ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO FEDERAL CLAIMS AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO STATE LAW CLAIMS |

## **INTRODUCTION**

This case arises from a mistaken identity.  On New Year's Day 2024, Honolulu police officers spent hours pursuing a man named Sidney Tafokitau across the island of Oʻahu.  During the pursuit, Tafokitau was armed with an assault rifle and fired at officers at several points, wounding one officer in the abdomen.  The pursuit ended late that afternoon when Tafokitau, after shooting another officer, was killed.  The officers, thankfully, survived.

Plaintiff Tevitatonga Cadiente had nothing to do with those events.  He was spending New Year's Day at his home, at a distance from where the pursuit of Tafokitau ended, with his father, Plaintiff Vaokehekehe Mataele.  Hearing the sounds of

sirens coming through their window, Cadiente and Mataele left the house to see what was happening.

As a group of police officers were bringing the hours-long pursuit of Tafokitau to its end, a different group of officers encountered Cadiente. This latter group—several of whom are now Defendants here—mistook Cadiente for Tafokitau. They made this misidentification even though Cadiente was nearly two decades younger and nearly 50 pounds lighter than Tafokitau, lacked Tafokitau's distinctive neck tattoo, wore different clothing, was unarmed (in contrast to Tafokitau, who had been armed with an assault rifle), and was on foot rather than in a vehicle. After two officers approached Cadiente, he ran, and a police van struck him, pushing him into a chain-link fence. Several officers then pulled Cadiente out from against the fence and restrained him on the sidewalk. Cadiente was dazed and (a rational jury could find) essentially incapacitated. Nonetheless, officers proceeded to punch and strike him while he lay on the ground. At some point, the officers realized that Cadiente was not the man the police had been pursuing. By then, Cadiente had sustained significant injuries and had to be taken to the hospital.

Cadiente and Mataele brought this action against the City and County of Honolulu and nine officers, asserting federal and state law claims arising from the encounter. And Defendants now move for summary judgment on certain of these claims. Dkt. Nos. 177, 179. They concede that the officers mistook Cadiente for

Tafokitau, but contend that the misidentification was reasonable, the force they used was justified, and no rational jury could conclude otherwise.

There is no question that the officers who participated in the pursuit of Tafokitau placed themselves in significant danger.  It was unquestionably a fast-moving situation.  A jury could conclude, given this factual context, that the officers' actions were reasonable under the circumstances.  But on the record presented, a rational jury could reach the opposite conclusions.  Given these genuine disputes of material fact, summary judgment is not appropriate.  Defendants' motions are therefore denied.

## BACKGROUND

Because Defendants seek summary judgment, the court views the evidence in the light most favorable to Plaintiffs, the nonmoving parties, and draws all reasonable inferences in their favor.  *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  So viewed, the record presents two scenes that unfolded separately for most of New Year's Day 2024 before converging on University Avenue in Honolulu:  a day-long, island-wide police pursuit of an armed man, and a father and son who left their home to see what was happening.

As mentioned, the officers' pursuit centered on Sidney Tafokitau.  On the morning of January 1, 2024, the Honolulu Police Department ("HPD") began searching for Tafokitau, who was suspected of shooting his former girlfriend that morning and was already wanted in connection with two attempted-murder cases arising from

incidents in October and December 2023.  Dkt. No. 201-7, at PageID.1919; Dkt. Nos. 201-19, 201-20.  Police had information that Tafokitau was armed with an automatic rifle, and that information proved accurate:  over the course of the day, he fired at officers while engaging them in a car chase.  At 11:45 in the morning, Tafokitau carjacked a white Scion from its owner in Kaneohe, on the windward side of the island.  Dkt. No. 201-9, at PageID.1925.  After Tafokitau took the Scion, a photograph from the scene was distributed to the officers:  it showed him wearing a blue Nike shirt, a dark athletic jacket, multicolored camouflage shorts, and a cap.  Dkt. No. 201-24, at PageID.2074 (Exh. P-18).  Tafokitau was 41 years old, approximately six feet one inch tall, and about 258 pounds.  He had a stocky build and a tattoo extending along the left side of his neck—one that, according to an HPD report, could be seen from ten to fifteen feet away. Dkt. No. 192, at PageID.1379–81.

By late afternoon, the pursuit had reached the area around University Avenue. Tafokitau drove the Scion along University Avenue and fired at officers positioned nearby, striking one officer in the abdomen.  Officers, including members of HPD's Crime Reduction Unit, received radio reports that shots had been fired and that an officer was down.  The Scion then crashed into a bus stop near the intersection of University Avenue and Dole Street.  Tafokitau shot another officer in that area; officers returned fire and Tafokitau was killed.

Plaintiffs Tevitatonga Cadiente and Vaokehekehe Mataele were spending that afternoon at their home on Varsity Place, a short distance from University Avenue. After hearing police sirens, Cadiente and Mataele left their home and walked north on University Avenue to get a closer look at what was happening. When they heard gunfire, they began to run. Dkt. No. 177-1, at PageID.1117. Cadiente was then 23 years old (18 years younger than Tafokitau), approximately six feet two inches tall and about 210 pounds (nearly 50 pounds lighter than Tafokitau despite being around the same height), with a lean build and no neck tattoo. Dkt. No. 192, at PageID.1379–81. That day, he was wearing a black Las Vegas Raiders jersey bearing the silver number "83" and the name "Waller" on the front and back, along with camouflage shorts of a different pattern than Tafokitau's—orange, green, black, tan, and white, with a "Hawaii's Finest" logo on the left thigh. As he jogged north on University Avenue, he was barefoot and unarmed, carrying only his cell phone. *Id.*

The two scenes converged minutes later. Officers Masakazu Kurita and Joseph Pagan, who had heard the radio reports that shots had been fired and an officer was down, were traveling mauka—that is, inland, away from the ocean—on University Avenue in an unmarked vehicle when Officer Kurita saw a man wearing camouflage shorts and a dark shirt running mauka on the east sidewalk. Dkt. No.201-26, at PageID.2081. Officers Kurita and Pagan stopped near the man—who turned out to be Cadiente—and identified themselves as police officers, after which Cadiente ran. Dkt.

5

No. 177-1, at PageID.1123–24; Dkt. No. 202, at PageID.2292.  Moments later, at approximately 4:14 p.m., a police van driven by Officer Christopher Chu in pursuit of Tafokitau, was traveling approximately 55 to 60 miles per hour in a 25-mile-per-hour zone.  Dkt. No. 201-1, at PageID.1874; *see also* Dkt. No. 201-25.  That van struck Cadiente, launching him into the air, before he was pinned against a chain-link fence. Officers exited their vehicle and approached Cadiente, removing him from the sliver of space between the van and the fence, and pulled him along the ground toward the rear of the van.

Within minutes of the collision, ten or more officers had gathered around Cadiente, who was lying prone on the ground.  Dkt. No. 201-1, at PageID.1879.  By one account, he "appeared dazed."  Dkt. No. 201-13, at PageID. 1964 (Exh. P-7).  The officers then pulled him away and onto the sidewalk, surrounded him, and used various forms of force while restraining him.  Exh. P-4.  Officer Barboza delivered "three closed-fist strikes" and a "downward leg strike."  Dkt. No. 201-12, at PageID. 1951 (Exh. P-6). Officer Lee used his foot to press down on Cadiente's upper body.  Dkt. No. 201-13, at PageID. 1968 (Exh. P-7).  Officer Domingo delivered hand strikes to Cadiente's upper torso, ribs, and left arm.  Dkt. No. 201-14, at PageID.1988 (Exh. P-8).  Officer Chu pulled Cadiente to the ground to "gain control" of him to attempt to put him in handcuffs. Dkt. No. 201-15, at PageID.2002 (Exh. P-9).  And Officer Sung gave Cadiente "closed fist strikes to the left upper torso area as a form of pain compliance."  Dkt. No. 201-16, at

PageID.2012.  Officer Soto asked Cadiente, "You guys want to shoot at [cops]?"  Dkt. No. 201-7, at PageID.2021; Dkt. No. 201-10 (Exh. P-4).

But the officers soon began to realize that Cadiente was not their suspect.  Body camera footage shows Officer Soto stomping on Cadiente several times between 4:16:40 and 4:16:47 p.m., with its audio capturing him stating, "I don't think this is our guy, man."  Exh. P-4 at 16:16:30-52.  Officer Gonsalves pulled Officer Soto away, but Officer Soto returned and delivered three or four knee strikes—not because he continued to believe Cadiente was Tafokitau, but, he claimed, because Cadiente was "still moving around" and might have been a second suspect.  *Id.* at PageID.1377; Dkt. No. 68, at PageID.611.  Five minutes later, at 4:20:40, the officers confirmed that Cadiente was not Tafokitau, dispatching, "THE PERSON AT DOLE AND UNIV IS NOT SIDNEY / CORRECT."  *Id.*

An ambulance was called for Cadiente at 4:15:21 p.m, and he was transported to the hospital in handcuffs.  The emergency medical services report from his transport team documented head trauma, "[m]ultiple hematomas to entire forehead, cheeks, nose, and right ear," "active venous bleeding," and "possible bleeding from right ear, difficult to find source due to blood covering his entire face."  Dkt. No. 201-53, at PageID.2250-51.  At the hospital, he was diagnosed with a concussion, a fractured nose, several lacerations requiring sutures, a dislocated left kneecap, impaction fractures of the patella and lateral femoral condyle, and a partial ACL tear.  Dkt. No. 201-1, at

7

PageID.1882.  Mataele, who had been on the sidewalk when the van struck his son and remained nearby throughout, appears in body camera footage lying on his side on the sidewalk, moaning.  Dkt. No. 193, at PageID.1404; *See* Exh. P-4.

This lawsuit followed, and Defendants filed motions to dismiss, which the court denied.  *See Cadiente v. City and Cnty. of Honolulu*, Civ. No. 24-00022, 2024 WL 1703126 (D. Haw. Apr. 19, 2024).  Discovery followed, and Defendants then filed their motions for partial summary judgment.

Since the summary judgment motions were filed, a number of Plaintiffs' claims have been resolved by joint stipulation.  All claims against Officers Pagan and Kurita— who were named in Claim I for an alleged illegal investigatory *Terry* stop—have been dismissed with prejudice.  Dkt. No. 199.  All claims against Officer John Otto—named in Claim IV for failure to intervene—have likewise been dismissed with prejudice.  Dkt. No. 185.  The parties have also stipulated to dismiss with prejudice Claim II, which alleged unlawful arrest and excessive force against Officers Chu and Sung, arising from the van collision.  Dkt. No. 208; *see* Dkt. No. 209.  Finally, Plaintiffs have stipulated to dismiss their claim for negligent infliction of emotional distress.  Dkt. No. 198.

The court held a hearing on the summary judgment motions on June 23, 2026. Dkt. No. 213.  At that hearing, all counsel confirmed that the remaining defendants are Officers Patrick Sung, Douglas Lee, Christopher Chu, Ryan Domingo, Hubert Louiz Barboza, and Darren Lee Soto (collectively, the "Officer Defendants"), and the City and

8

County of Honolulu (the "City").  Counsel likewise confirmed that the claims that remain for resolution are:  (1) Claim III, a 42 U.S.C. § 1983 excessive force claim against the Officer Defendants, arising from the physical detention that followed the van collision; (2) Claim IV, a § 1983 failure-to-intervene claim against the Officer Defendants; (3) Claim V, an intentional infliction of emotional distress ("IIED") claim against the Officer Defendants; (4) Claim VI, which raises assault, battery, and false imprisonment claims against the Officer Defendants; and (5) Claim VII, a respondeat superior claim against the City, which is derivative of the state law claims.[1]

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  One purpose of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

---

[1]    Given the apparent progress of settlement discussions, *see* Dkt. Nos. 214 and 216, the court informed the parties that it would hold Defendants' motions in abeyance, but invited any party to request that the court proceed with issuing its written decision. Dkt. No. 218.  A party so requested, and this order therefore follows.

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (cleaned up).  Once the movant has met this burden, the burden shifts to the nonmoving party, who must "go beyond the pleadings and, by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (cleaned up).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.

The court must review the record as a whole and draw all reasonable inferences in favor of the nonmoving party.  In determining whether summary judgment is appropriate, the court does not weigh the evidence but only determines whether there is a genuine issue for trial.  *Tolan*, 572 U.S. at 657.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.  And a fact is "material" only if it would affect the outcome of the case.  *Id.*

10

## DISCUSSION

Defendants separately move for partial summary judgment on the federal and state claims.  As to the federal claims, they argue that the Officer Defendants are entitled to summary judgment because Plaintiffs' claims fail as a matter of law on the merits.  As to the state law claims, they argue that the Officer Defendants are shielded as a matter of law by Hawaiʻi's conditional privilege doctrine.  The court addresses each set of contentions in turn.

### A.    Federal Claims

We begin with the remaining federal claims—Claims III and IV—both of which arise under 42 U.S.C. § 1983.  Dkt. No. 68, at PageID.608-612.  Defendants move for summary judgment on both of these claims.

#### 1.    Excessive Force (Claim III)

In Claim III, Plaintiffs allege that Officers Sung, Lee, Chu, Domingo, Barboza, and Soto used constitutionally excessive force against Cadiente during the events that followed the van collision—specifically, in the physical takedown and the strikes inflicted while Cadiente lay prone on the sidewalk.

a.  Defendants' summary judgment briefing is limited in an important respect, one that ultimately dictates the result here:  they argue that Claim III fails as a matter of law, but they do not argue that the force used against Cadiente would be reasonable as a matter of law if their misidentification of him as Tafokitau was unreasonable.  That is

11

to say, Defendants' argument for summary judgment on the excessive force claim rests on the premise that the Officer Defendants reasonably believed Cadiente was Tafokitau. In Defendants' view, it is this belief—which Defendants contend was reasonable as as matter of law—that justified, again as a matter of law, both the decision to detain him and the force used to do so.  *See* Dkt. No. 177-1, at PageID.1127 (asserting that "the Officer Defendants had a reasonable belief that they were in immediate danger of death or serious bodily injury and were justified in believing that Cadiente was Tafokitau").  And as counsel for Defendants confirmed at the hearing, Defendants' briefing nowhere argues that the force employed would have been constitutionally reasonable if Officers' misidentification was unreasonable.  In other words, Defendants accept, at least for purposes of summary judgment, that if a rational jury could find the misidentification was unreasonable, the use of force against Cadiente (which they of course would still defend at trial) would not be reasonable as a matter of law.

That concession proves fatal to Defendants' motion.  The constitutional reasonableness of an officer's identification is assessed based on the information known to them at the time.  *See Reynaga Hernandez v. Skinner*, 969 F.3d 930, 938 (9th Cir. 2020); *Sharp v. County of Orange*, 871 F.3d 901, 910 (9th Cir. 2017).  And in this case, Plaintiffs have marshaled evidence from which a rational jury could find the misidentification unreasonable.  Dkt. No. 192, at PageID.1379-81.  To begin with, they point to the physical differences between Cadiente and Tafokitau, which they argue were

12

significant.  A rational jury could readily agree.  Tafokitau was 41 years old, 6′1″, and weighed approximately 258 pounds and had a stocky build.  Cadiente, on the other hand, was 18 years younger, and—although he was an inch taller than Tafokitau—weighed approximately 210 pounds, nearly 50 pounds less than Tafokitau, with a lean build.  Tafokitau had a distinctive tattoo running from the back to the front of his left neck, which was visible from 10 to 15 feet away, according to at least one HPD report.  Cadiente had no such tattoo.  Based on this evidence, a rational jury could conclude that it was not constitutionally reasonable for the Officer Defendants to misidentify Cadiente as Tafokitau.  That is especially true for Officer Soto, who had personally arrested Tafokitau just 41 days earlier—transporting him to a hospital for treatment and to the police station—which was a substantial prior opportunity to observe how Tafokitau looked, as well as his distinctive neck tattoo.  But it is true for all of the Officer Defendants, who had an opportunity to observe the significant physical differences between Cadiente and Tafokitau, not in the evening or the dark, but in the light of the late afternoon.

There is more:  Plaintiffs point to evidence that on January 1, a color photograph of Tafokitau, taken from the scene of the carjacking he committed earlier that day, had been disseminated to all Officer Defendants.  That photograph showed Tafokitau wearing a blue Nike shirt, a dark athletic jacket, multicolored camouflage shorts, and a cap.  Dkt. No. 201-24, at PageID.2074 (Exh. P-18).  Cadiente, by contrast, was wearing a

13

black Las Vegas Raiders jersey with the silver number "83" and the name "Waller"

prominently displayed on the front and back.  He was wearing camouflage shorts, but

they bore a different pattern:  orange, green, black, tan, and white, with a "Hawaii's

Finest" logo on the left thigh.  He was barefoot.  In his hands, he was holding nothing

but a cell phone.  Unlike Tafokitau, who police had observed with an assault rifle,

Cadiente did not have any weapon.  A rational jury could rely on these differences, too,

to conclude that the misidentification of Cadiente as Tafokitau was unreasonable.

*Accord Brown v. Stewart*, 910 F. Supp. 1064, 1072 (W.D. Pa. 1996) (denying summary

judgment because evidence supported a finding that officers unreasonably arrested the

wrong person despite discrepancies between the plaintiff and the suspect's

photograph).[2]

The Officer Defendants resist this conclusion, but their arguments to the contrary

are not convincing.  To be sure, they are correct that the conditions under which the

Officer Defendants worked were dangerous and fast-moving.  And they are also correct

that their position draws support from the fact that Cadiente was in the vicinity where

Tafokitau had been active at the tail end of the hours-long pursuit, as well as that

Cadiente himself ran from Officers Pagan and Kurita.  These facts weigh in favor of a

---

[2]    Defendants respond that it was reasonable for officers to infer that Tafokitau
might have changed clothes during the police pursuit.  *See* Dkt. No. 201-13, at
PageID.1967 (Deposition of Officer Lee).  A jury could make that finding, but the record
does not compel it as a matter of law.

14

finding that the misidentification was reasonable.  But on the present record—and in light of the substantial differences between Cadiente and Tafokitau that the record allows a jury to find—it does not weigh so decisively in the Officer Defendants' favor as to make the misidentification reasonable as a matter of law.

The Officer Defendants also note that both Cadiente and Tafokitau were Tongan men with goatees, and that each was wearing camouflage-print shorts on January 1.  *See* Dkt. No. 177-1, at PageID.1117.  Once again, these are facts that support their position and that a jury might rely on at trial to find that the misidentification was reasonable.  But they are not enough to compel the conclusion that the misidentification was reasonable as a matter of law.

Finally, during their testimony, multiple officers stated that they heard a radio dispatch indicating that the suspect was "on foot" running down University Avenue before they encountered Cadiente.  Dkt. No. 177-1, at PageID.1123-24; Dkt. No. 202, at PageID.2292-93.  And that radio transmission, the Officer Defendants contend, formed part of the basis for their belief that Cadiente was the suspect.  But this argument does not appear to have solid footing in the record.  As Plaintiffs observe, the radio transmission—or CADS—records tell a different story from the one Defendants attempt to advance.  Dkt. No. 201-25 (Exh. P-19).  The "ON FOOT" entry was logged at 4:15:36 p.m.  *Id*. at PageID.2077.  The "DOWN UNIVERSITY MAUKA JUST PAST DOLE" entry was logged at 4:15:55 p.m.  *Id*.  Meanwhile, the officers' van struck Cadiente at 4:14 p.m.

15

The ambulance was called for Cadiente at 4:15:21 p.m. *Id*. This evidence would support a jury finding that the force the Defendant Officers used on Cadiente occurred between 4:14 p.m. and 4:15:21 p.m., all before the radio dispatch came through. In other words, the record supports the inference that the radio transmissions the officers claim as the basis for their belief that Cadiente was Tafokitau came *after* Cadiente had already been struck by the officers.

In short, a rational jury might well accept some or all of the Officer Defendants' factual arguments. But the court cannot accept them at this procedural stage. The question for summary judgment is not whether reasonable officers could have made the misidentification; it is whether the misidentification was reasonable as a matter of law. Defendants cannot clear that bar in the face of evidence showing that Cadiente bore significant physical differences from Tafokitau, had no neck tattoo, was dressed in clothing visibly different from that shown in the disseminated photograph, was on foot, and was unarmed and holding only a cell phone. On this record, whether the misidentification was reasonable is a genuine dispute of material fact, one that must go to a jury. And because the Officer Defendants' concede that summary judgment on the excessive force claim is appropriate only if their misidentification was reasonable as a matter of law, that claim, too, must go to a jury.

//

//

16

b.  The Officer Defendants offer a backup argument:  that Count III should fail as a matter of law because Plaintiffs cannot identify which specific officer delivered each specific blow.

It is true that Plaintiffs' evidence does not allow that degree of precision; the body-camera footage captures the scene, but does not fully capture the details of how Cadiente or the officers were acting.  And Cadiente, who was being repeatedly struck, understandably cannot now make a precise accounting of which officer did what.  But on the present record, this is not a reason to grant summary judgment.  When multiple officers participate in a detention and injuries result, and when the officers are uniquely positioned to know the circumstances that caused the plaintiff's injuries, a plaintiff need not attribute specific blows to specific individuals to defeat summary judgment.  *See Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002) (Silverman, J., concurring); *Loharsingh v. City & County of San Francisco*, 696 F. Supp. 2d 1080, 1104 (N.D. Cal. 2010); *Bynum v. County of Los Angeles*, 2023 WL 4143268, at *5 (C.D. Cal. May 22, 2023).  And that is precisely the case here.  Cadiente was surrounded by six named officers.  He sustained severe injuries to his head and face.  And there is no dispute that his injuries occurred during the detention.  Accordingly, although the evidence might not establish precisely which blows were struck by which officer, a rational jury could find that each of the Officer Defendants substantively participated in the use of force.

Defendants also advance more particularized arguments as to two of the Officer Defendants, but their arguments do not justify summary judgment even in part. As to Officer Lee, Defendants argue that the allegations against him are factually incorrect—that he was positioned near Cadiente's feet and legs, not his head, and used only a foot to sweep Cadiente's arm and push his back. Dkt. No. 177-1, at PageID.1128. But Officer Lee himself admitted to using his foot to push down on Cadiente's upper body. Dkt. No. 201-13, at PageID. 1968 (Exh. P-7). Whether that force was excessive given all the circumstances—including the fact that Cadiente had just been struck by a van and was lying injured on the sidewalk—is a question for the jury, not this court.[3]

As to Officer Soto, Defendants' reply argues that the opposition impermissibly shifts the theory of liability by attributing the stomping visible on body-camera footage to Officer Soto rather than to Officer Lee, as alleged in the Third Amended Complaint ("TAC"). Dkt. No. 202, at PageID.2294. But the TAC itself expressly alleged that Officer Soto "boot-stomp[ed] directly on Mr. Cadiente" and "stomp[ed] on Mr. Cadiente's face." Dkt. No. 68, at PageID.609, ¶ 105. On those facts, Plaintiffs do not present a new theory; as a result of discovery, they merely clarify which officer the body-camera footage depicts doing what. Moreover, Officer Soto's second engagement with

---

[3]    Defendants argue in their reply that Plaintiffs failed to address their Officer-Lee-specific arguments and that the excessive force claim against Officer Lee should therefore be treated as conceded. Dkt. No. 202, at PageID.2293. But Plaintiffs' opposition addressed the body-camera evidence and their theory that each officer present during the beating participated in the force used.

Cadiente—returning after being pulled away by another officer to deliver additional knee strikes, by his own admission not because he believed Cadiente was Tafokitau but because Cadiente might have been "a second suspect"—presents an independent basis for an excessive force finding, one untethered to the misidentification rationale that underlies the rest of the claim.  A rational jury could find that at the time Officer Soto returned, there was no probable cause to believe Cadiente was a suspect or a danger.

For all of these reasons, the court concludes that genuine disputes of material fact preclude summary judgment on Claim III.

### 2.    Failure to Intervene (Claim IV)

Plaintiffs' Claim IV alleges that the Officer Defendants failed in their duty to intervene to stop the excessive force being applied to Cadiente.

It is well established that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (cleaned up).  The duty requires, as a threshold matter, that a constitutional violation actually occur.  *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).  And the duty extends only to officers who had a realistic opportunity to intervene to prevent the harm.  *See Hall v. City & County of Honolulu*, No. CV 21-00248, 2024 WL 1348635, at *5 (D. Haw. Mar. 29, 2024).

Defendants advance three arguments for summary judgment on Claim IV.  None is sufficient.  First, Defendants argue that because the force used was not excessive, no

19

duty to intervene ever arose. *See Jackson*, 268 F.3d at 653. As discussed above, that premise cannot be conclusively established on this record. Because genuine disputes of material fact preclude summary judgment on the excessive force claim, the excessive-force predicate for Claim IV survives as well.

Second, Defendants invoke the principle that officers may not be held liable for failure to intervene merely on the basis of their presence at the scene of a constitutional violation, and that liability cannot rest on a "team effort" theory that lumps all officers together without regard to individual conduct. *See Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018); *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022); *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996). That is an accurate statement of the law, but it does not support summary judgment here. Plaintiffs do not rest Claim IV on a "team effort" theory; they assert that each officer present had a realistic opportunity to stop the beating and failed to take it. *See* Dkt. No. 68, at PageID.610-12. Whether that is true of each individual officer is a factual question that cannot be resolved on summary judgment. After all, the record suggests that intervention was not merely possible in theory: one non-defendant officer—Officer Gonsalves—actually did pull Officer Soto away from Cadiente during the encounter. Dkt. No. 68, at PageID.611. Ten or more other officers surrounded Cadiente within two and a half minutes of the van collision. A rational jury could find that each of the named Officer Defendants had a realistic opportunity to intervene. Whether they did is a question the jury must resolve.

20

Third, Defendants' reply argues that Plaintiffs failed to assert that each Officer Defendant had supervisory authority over an offending officer, and that this failure should be treated as a concession.  Dkt. No. 202, at PageID.2295.  But this argument is not an accurate recitation of the law.  The Ninth Circuit has long recognized that all officers—not just supervisors—have a duty to intercede when fellow officers are violating a suspect's constitutional rights, provided the officer had a realistic opportunity to do so.  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  The duty flows from the constitutional right itself, not from the chain of command:  each officer on scene thus had an obligation to act, not because they outranked their colleagues, but because the law requires officers to stop what they know to be unconstitutional force when they have the opportunity to do so.  So Plaintiffs' failure to specifically engage with an argument grounded in an incorrect premise does not constitute a concession.

Summary judgment on Claim IV is denied.

### 3.    Qualified Immunity

Having concluded that genuine disputes of material fact preclude summary judgment on the merits of Claims III and IV, the court turns to qualified immunity.

Defendants' litigation decisions have made the issue a simple one at this stage in the case.  In their briefing, Defendants sought qualified immunity only as to Claim II:  in their opening brief, they argued that Officers "Chu and Soto were not on notice that using the van to unintentionally collide with Cadiente was an excessive use of force."

21

Dkt. No. 177-1, at PageID.1127.  That argument was directed at Claim II, the unlawful arrest and excessive force claim arising from the van collision itself.  And that claim has since been dismissed by stipulation, and the motion for summary judgment has been withdrawn as to it.  Dkt. Nos. 208, 209.  Defendants' only specific qualified immunity argument is therefore moot.  And at the hearing on the motions, Defendants' counsel confirmed that, apart from the van-collision argument directed at Claim II, Defendants raised no qualified immunity argument in their summary judgment briefing addressed to Claim III or Claim IV.  *See generally*, Dkt. No. 177-1, at PageID.1122-28.

Qualified immunity is an affirmative defense that the defendant must plead. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  A defendant who does not seek qualified immunity as to a particular claim in their opening brief forfeits the defense as a ground for that motion.  *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (declining to consider an argument not "argued specifically and distinctly in a party's opening brief" (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986))).  And the Supreme Court has recently admonished lower courts not to "violate[] the party-presentation principle" by deciding "a case different from the one" a party has advanced.  *Margolin v. Nat'l. Ass'n. of Immig. Judges*, 146 S. Ct. 1285, 1288 (2026) (cleaned up).  Adhering to the party-presentation principle here, the court must conclude that any request for qualified immunity as to Claims III and IV lacks support in the briefing and does not provide an independent ground for granting summary judgment.

Nor can the court say that Defendants would obviously have prevailed, at the motion for summary judgment stage, had they not forfeited their qualified immunity defense. Under the doctrine of qualified immunity, government officials are shielded from civil liability for damages unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up). Courts may address the two prongs in either order. *Id*. at 236. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (cleaned up). The court's inquiry must be particularized to the facts of the case—"existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. The plaintiff bears the burden of showing that the right was clearly established at the time of the violation; if they meet that burden, the defendant then bears the burden of showing that they reasonably believed their conduct was lawful. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

Because Defendants raised no qualified immunity claim in their briefing for Claims III and IV, Plaintiffs have not dwelled on the question of whether the rights implicated by those claims—the right to be free from excessive force during a custodial beating, and the right to have officers intervene to stop such force—were clearly established at the time of the incident. But it is far from evident, on this record, that

23

Plaintiffs would have been unable to demonstrate that the rights were clearly established, in the particular factual context presented here, had Defendants not forfeited their affirmative defense.  It has long been clearly established in this circuit that an officer may not inflict serious physical injuries on a restrained person who poses no threat, and that officers have a duty to intervene when fellow officers do so.  *See, e.g.,* *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) ("If a jury were to find that [the officer] shot and/or stomped on [the plaintiff's] head after [the plaintiff] no longer posed an immediate threat, [the officer] would have been 'on notice that his conduct would be clearly unlawful.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001))); *Cunningham*, 229 F.3d at 1289.  Given that a jury could rationally find that Cadiente no longer posed an immediate threat at the time officers used force against him, it appears that Plaintiffs could have survived summary judgment on this issue even if Defendants had not forfeited it.

In short, qualified immunity does not entitle the Officer Defendants to summary judgment on Claim III or Claim IV.  But because a defendant's decision not to raise a qualified immunity defense at the summary judgment stage does not preclude them from raising it before the jury, Defendants remain free to assert the defense at trial, with any disputed facts to be resolved by the jury and the ultimate legal question of qualified immunity reserved for the court.  *See Morales v. Fry*, 873 F.3d 817, 824-26 (9th Cir. 2017).

C.    State Law Claims

Defendants also move for partial summary judgment on Plaintiffs' three remaining state law claims:  Claim V (IIED), Claim VI (assault, battery, and false imprisonment), and Claim VII (respondeat superior against the City).  They argue that the Officer Defendants are entitled to conditional privilege under Hawai'i law, and that each of the state law claims fails on its merits.

1.    Conditional Privilege

Under Hawai'i law, government officials performing discretionary functions are shielded from state tort liability by the doctrine of conditional privilege.  The Hawai'i Supreme Court has held that "the best way to balance the interests of the maliciously injured party against the innocent official is to allow the action to proceed but to limit liability to only the most guilty of officials by holding plaintiff to a higher standard of proof than in a normal tort case."  *Medeiros v. Kondo*, 55 Hawai'i 499, 504, 522 P.2d 1269, 1272 (1974).  Accordingly, conditional privilege shields officials from liability unless the plaintiff adduces "clear and convincing proof that defendant was motivated by malice and not by an otherwise proper purpose."  *Id.* at 504-05, 522 P.2d at 1272.

"Malice" for this purpose is defined as "the intent, without justification or excuse, to commit a wrongful act," "reckless disregard of the law or of a person's legal rights," or "ill will; wickedness of heart."  *Awakuni v. Awana*, 115 Hawai'i 126, 141, 165 P.3d 1027, 1042 (2007) (cleaned up).  The conditional privilege extends to the City by

25

operation of respondeat superior:  if the Officer Defendants are entitled to privilege, so is the City; and if they are not, the City's liability follows from theirs.  *See Medeiros*, 55 Haw. at 504, 522 P.2d at 1272; *Awakuni*, 115 Haw. at 140-41, 165 P.3d at 1041-42.

On this record, whether the Officer Defendants acted with malice is genuinely disputed.  Defendants argue that the officers reasonably believed they were pursuing an armed suspect and that their actions reflected legitimate law enforcement objectives. Dkt. No. 179-1, at PageID.1239-40; Dkt. No. 204, at PageID.2353.  But Plaintiffs have presented evidence from which a reasonable jury could find malice or reckless disregard.  That evidence includes the apparent inconsistency between the CADS timeline and the officers' asserted justification; Officer Soto's statement during the encounter that "I don't think this is our guy," made alongside his taunt, "You guys want to shoot at cops?"; and his return to use additional force after another officer had pulled him away—and after he had voiced doubt about Cadiente's identity.  A jury could also consider the nature and severity of Cadiente's injuries and the duration of the force used.  Taken together, this evidence might support a finding that the officers acted not out of a mistake, but recklessly or maliciously.  The applicability of the conditional privilege therefore cannot be resolved on summary judgment.

### 2.     Intentional Infliction of Emotional Distress (Claim V)

To establish a claim for intentional infliction of emotional distress under Hawaiʻi law, a plaintiff must show:  (1) that the act allegedly causing harm was intentional or

26

reckless; (2) that the act was outrageous; and (3) that the act caused (4) extreme emotional distress to another. *Hac v. University of Hawai'i*, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003). The term "outrageous" has been construed to mean "without just cause or excuse and beyond all bounds of decency." *Enoka v. AIG Hawai'i Ins. Co.*, 109 Hawai'i 537, 559, 128 P.3d 850, 872 (2006) (cleaned up). Emotional distress under this standard "includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Hac*, 102 Haw. at 106, 73 P.3d at 60 (quoting Restatement (Second) of Torts § 46, cmt. j (1965)). Physical illness is no longer a required element of the claim. *Id.*

Whether the conduct at issue is "outrageous" is in the first instance a question for the court, "although where reasonable people may differ on that question it should be left to the jury." *Takaki v. Allied Machinery Corp.*, 87 Hawai'i 57, 68, 951 P.2d 507, 518 (Haw. Ct. App. 1998). This is a case in which reasonable people could differ. If the misidentification was unreasonable, if the force was excessive, and if officers continued to inflict injuries on a man already lying bloodied on a sidewalk after one said, "I don't think this is our guy," a reasonable jury could find that the conduct was "beyond all bounds of decency." *Enoka*, 109 Hawai'i at 559, 128 P.3d at 872. The question of outrageousness goes to the jury.

In moving for summary judgment on this claim, Defendants argue that Plaintiffs were unable to articulate their emotional distress at deposition—that Cadiente reported

his girlfriend noticed a change in his personality but that he himself did not feel different, and that Mataele similarly could not describe how his mental health had been affected.  Dkt. No. 179-1, at PageID.1242; Dkt. No. 204, at PageID.2354.  But the absence of well-articulated long-term consequences does not foreclose an IIED claim under Hawaiʻi law.  The injury inquiry encompasses "all highly unpleasant mental reactions," which in this case might include the immediate fright and shock of being struck by a van traveling at high speed, dragged across a sidewalk, and beaten while surrounded by armed officers.  *Hac*, 102 Haw. at 106, 73 P.3d at 60.  Whether the immediate and ongoing effects of the incident rise to the level of "extreme emotional distress" is a question for the jury.  *See Park v. Oahu Transit Servs., Inc.*, No. 10-00445, 2011 WL 3490190, at *10 (D. Haw. Aug. 10, 2011).

Defendants also argue that Officer Soto's taunt—"You guys want to shoot at cops?"—cannot be imputed to the other officers to establish malice, citing the principle that one officer's conduct is not automatically attributed to co-officers.  Dkt. No. 204, at PageID.2353; *see Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009) (explaining that mere presence at the scene does not make an officer responsible for another's conduct).  That is correct as a statement of law.  But the IIED claim does not depend on imputing Officer Soto's taunt to the others:  each officer's liability rests on his own conduct.  Officer Soto's taunt is relevant to the malice inquiry as to Officer Soto; the other officers' individual conduct is separately evaluated.

Plaintiff Mataele's IIED claim presents an additional basis for recovery.  The Restatement (Second) of Torts, adopted by the Hawai'i Supreme Court in *Hac*, provides that where extreme and outrageous conduct is directed at a third person, the actor is subject to liability to "a member of such [third] person's immediate family who is present at the time, whether or not such distress results in bodily harm."  Restatement (Second) of Torts § 46(2)(a).  Mataele, Cadiente's father, was on the sidewalk beside his son when the van struck Cadiente and was present throughout the events that followed.  Body-camera footage captured him lying on his side on the sidewalk, moaning.  A reasonable jury could therefore find that Mataele experienced severe emotional distress as a result of witnessing a police van strike his son at highway speed and the subsequent events.  Dkt. No. 193, at PageID.1404.

Summary judgment on Claim V is denied.

### 3.    Assault, Battery, and False Imprisonment (Claim VI)

Plaintiffs' Claim VI asserts assault, battery, and false imprisonment against the Officer Defendants under state law.  Defendants seek summary judgment on the grounds that the force used was reasonably necessary and therefore privileged.

Under Hawai'i law, an officer is not liable for injuries inflicted through the use of reasonably necessary force to preserve the peace, maintain order, or overcome resistance to authority.  *Leong Sam v. Keliihoomalu*, 24 Hawai'i 477, 482 (Haw. Terr. 1918); *see also Raymond v. County of Kauai*, Civ. No. 15-00212, 2017 WL 2815059, at *12 (D. Haw.

29

June 26, 2017).  The analysis mirrors the federal excessive force inquiry:  whether the force was "reasonably necessary" is evaluated under the objective reasonableness standard.  *See Graham*, 490 U.S. at 396-97.  For the same reasons that genuine disputes of material fact preclude summary judgment on the federal excessive force claim, they also preclude summary judgment on the state law assault and battery claims.

On the false imprisonment claim, Defendants' sole argument is that "handcuffing as a means of detaining an individual does not automatically escalate a stop to an arrest."  Dkt. No. 177-1, at PageID.1124 (quoting *United States v. In*, 124 F.4th 790, 795 (9th Cir. 2024)).  But under Hawaiʻi law, false imprisonment requires a detention against the plaintiff's will and the unlawfulness of that detention.  *Dural v. City & County of Honolulu*, 658 F. Supp. 3d 855, 867 (D. Haw. 2023).  And in arguing that Cadiente was arrested, Plaintiffs do not rely on handcuffing alone.  The record shows that Cadiente was struck by a police van traveling at approximately 55 to 60 miles per hour in a 25-mile-per-hour zone, causing him to fly backward into a chain-link fence. After the van struck him, officers dragged him from the front of the van to its rear without asking for identification or rendering aid.  He was then forced to the ground and held prone while multiple officers struck him, causing injuries.  He was transported to the hospital in handcuffs and in serious condition.  That the claims arising from the van strike have been dismissed by stipulation does not remove the collision from this

30

analysis.  A jury could find that the strike itself contributed to the arrest by incapacitating Cadiente and enabling the officers to restrain him.

Defendants' argument for summary judgment on the state law claims does not address this constellation of facts. Whether the totality of those circumstances—the van strike, physical takedown, prolonged beating, and transportation to a hospital in handcuffs—constituted a de facto arrest is a question of fact for the jury.

Summary judgment on Claim VI is denied.

### 4.    Respondeat Superior (Claim VII)

Claim VII asserts respondeat superior liability against the City.  Under Hawai'i law, a municipality may bear respondeat superior liability for torts maliciously committed by an employee within the scope of employment.  *McCormack v. City & County of Honolulu*, 762 F. Supp. 2d 1246, 1253 (D. Haw. 2011).  The conditional privilege that protects the Officer Defendants also extends to the City by operation of respondeat superior.  *See Medeiros*, 55 Haw. at 504, 522 P.2d at 1272; *Awakuni*, 115 Hawai'i at 140-41, 165 P.3d at 1041-42.  Conversely, if Plaintiffs' claims succeed against the Officer Defendants, the claim against the City necessarily follows.  *See Wong-Leong v. Hawaiian Independent Refinery, Inc.*, 76 Hawai'i 433, 438, 879 P.2d 538, 543 (1994).

Plaintiffs have acknowledged this derivative relationship and stipulated that Claim VII fails if the court grants summary judgment to the Officer Defendants on all

state law claims.  Dkt. No. 193, at PageID.1399.  Because the court denies summary judgment on Claims V and VI, Claim VII against the City survives as well.

**CONCLUSION**

For the foregoing reasons, the Officer Defendants' Motion for Partial Summary Judgment as to Federal Claims, Dkt. No. 177, is DENIED.  Defendants' Motion for Partial Summary Judgment as to State Law Claims, Dkt. No. 179, is also DENIED.

The following claims and parties proceed to trial:  Claim III (excessive force under § 1983) against Officers Sung, Lee, Chu, Domingo, Barboza, and Soto; Claim IV (failure to intervene under § 1983) against the same officers; Claim V (intentional infliction of emotional distress) against the Officer Defendants; Claim VI (assault, battery, and false imprisonment) against the Officer Defendants; and Claim VII (respondeat superior) against the City and County of Honolulu.

IT IS SO ORDERED.

DATED:  July 23, 2026, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

*Cadiente v. City and County of Honolulu, et al;* Civil No. 24-00022 MWJS-WRP; ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO FEDERAL CLAIMS AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO STATE LAW CLAIMS